**UNITED STATES OF AMERICA**

**v.**

**LARRY DONNELL COTTON**

**Defendant.**

**Criminal Action No. 10-126 (JDB)**

## <u>MEMORANDUM OPINION</u>

On November 6, 1997, Defendant Larry Donnell Cotton was convicted of one count of indecent liberties with a minor in violation of N.C. Gen. Stat. § 14-202.1 (1995).  At the time of Cotton's conviction, North Carolina law required Cotton to register as a sex offender for a period of ten years following his release from prison.  N.C. Gen. Stat. § 14-208.7 (1995). When Cotton was released from jail in October 1998, he signed a notice that explained: "If a person required to register changes address, the person shall provide written notice of the new address not later than the tenth day after the change to the sheriff of the county with whom the person had last registered."  Gov't's Opp. to Def.'s Mot. to Dismiss Indictment ("Gov't's Opp.") [Docket Entry 12] at 1-2.

On June 8, 2010, a grand jury in this District returned a one count superseding indictment against Cotton, charging him with failure to register as required by the Sex Offender Registration

and Notification Act ("SORNA" or "the Act"), 42 U.S.C. § 16901 et seq., "in the District of Columbia and elsewhere." Superseding Indictment 1[Docket Entry 5]. Cotton's indictment charges activity in violation of SORNA "between on or about May 2007 and on or about October 2008." Id. Cotton moves to dismiss the indictment, asserting eight separate grounds for dismissal. First, Cotton asserts that he was "unable" to register under existing District of Columbia law. Second, Cotton contends that SORNA is not applicable to him because the District of Columbia has yet to implement SORNA. Third, he claims that SORNA is not applicable to him because he was "unable" to "initially register" under Section 16913(b) of the Act. Fourth, Cotton maintains that Congress improperly delegated the legislative function of determining the applicability of SORNA to sex offenders with pre-SORNA convictions. Fifth, he asserts that the Attorney General's interim regulation, 28 C.F.R. § 72.3, which applies SORNA retroactively, was issued in violation of the Administrative Procedure Act. Sixth, Cotton asserts that the retroactive application of SORNA violates the Ex Post Facto Clause of the Constitution. Seventh, he argues that application of SORNA to him violates the Due Process Clause. And eighth, he maintains that SORNA is an unlawful exercise of federal power under the Commerce Clause.

**LEGAL BACKGROUND**

Congress enacted SORNA on July 27, 2006 as part of the Adam Walsh Child Protection and Safety Act. Pub. L. 109-248, Tit. I, 120 Stat. 590. SORNA's stated purpose is to "establish[] a comprehensive national system for the registration of sex offenders." 42 U.S.C. § 16901. "Since 1994, federal law has required states, as a condition for the receipt of certain law enforcement funds, to maintain federally compliant systems for sex-offender registration and

community notification." Carr v. United States, 130 S. Ct. 2229, 2235 (2010).  In an effort to make these state schemes more effective, SORNA expanded the information that states must collect and maintain in their sex offender registries, created a federal registration requirement, and criminalized the failure to register.  See 42 U.S.C. §§ 16901, 16913, 16914.  Among its provisions, SORNA established a federal criminal offense, 18 U.S.C. § 2250(a), covering any person who (1) "is required to register under [SORNA]"; (2) "travels in interstate or foreign commerce"; and (3) "knowingly fails to register or update a registration." See Carr, 130 S. Ct. at 2235.

In Carr, the Court determined that these elements are to "be read sequentially," meaning that "a person [who] becomes subject to SORNA's registration requirements . . . must then travel in interstate commerce and thereafter fail to register." Id. at 2235-36.  In other words, Carr clarified that "[o]nce a person becomes subject to SORNA's registration requirements, which can occur only after the statute's effective date, that person can be convicted under § 2250 if he thereafter travels and then fails to register." Id. at 2236.  Precisely when a sex offender, like Cotton, with a pre-SORNA conviction "becomes subject to SORNA's registration requirements," however, is in dispute.  See id. at 2234 n.2.  SORNA's registration requirements are laid out in 42 U.S.C. § 16913:

> (a) In general.  A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student. For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.

(b) Initial registration.  The sex offender shall initially register-
> (1) before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or

> (2) not later than 3 business days after being sentenced for that offense, if the sex offender is not sentenced to a term of imprisonment.

(c) Keeping the registration current.  A sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved pursuant to subsection (a) and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry. That jurisdiction shall immediately provide that information to all other jurisdictions in which the offender is required to register.

(d) Initial registration of sex offenders unable to comply with subsection (b).  The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b).

The Act thus provides in subsection (d) that "[t]he Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before July 27, 2006." 42 U.S.C. § 16913(d).  Pursuant to this authority, on February 28, 2007, the Attorney General issued an interim rule "to eliminate any possible uncertainty about the applicability of [SORNA's] requirements," 72 Fed. Reg. 8894, 8896 (2007), and stated that SORNA's requirements "apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of [SORNA]."  28 C.F.R. § 72.3.  When the Attorney General promulgated the interim rule, he did not provide notice of proposed rulemaking, 5 U.S.C. § 553(b), or allow a 30-day period before the rule became effective, 5 U.S.C. § 553(d), as required by the Administrative Procedure Act ("APA").  Instead, he invoked

the "good cause" exception of the APA for these requirements. See 5 U.S.C. §§ 553(b)(3)(B) & (d)(3); 72 Fed. Reg. 8894, 8896-97 (2007).

The Supreme Court in Carr did not resolve the "conflict among the Courts of Appeals as to when SORNA's registration requirements became applicable to persons convicted of sex offenses prior to the statute's enactment" or "as to whether § 72.3 was properly promulgated [under the APA]." Carr, 130 S. Ct. at 2234 n.2. The Court highlighted the conflicts in a footnote, explaining first that "[s]everal Circuits . . . have taken the position that the Act did not apply to such sex offenders until the Attorney General provided for their inclusion by issuing an interim regulation, 28 C.F.R § 72.3, 72 Fed. Reg. 8897, on February 28, 2007." Id.; see United States v. Valverde, 2010 WL 5263142, at *2 (9th Cir. 2010); United States v. Hatcher, 560 F.3d 222, 226-29 (4th Cir. 2009); United States v. Cain, 583 F.3d 408, 414-19 (6th Cir. 2009); United States v. Dixon, 551 F.3d 578, 582 (7th Cir. 2008); United States v. Madera, 528 F.3d 852, 857-59 (11th Cir. 2008) (per curiam). The Court further observed that "[o]ther Circuits have held that persons with pre-SORNA sex-offense convictions became subject to the Act's registration requirements upon the statute's enactment in July 2006." Carr, 130 S. Ct. at 2234 n.2; see United States v. DiTomasso, 621 F.3d 17, 23 (1st Cir. 2010); United States v. Hinckley, 550 F.3d 926, 929-35 (10th Cir. 2008); United States v. May, 535 F.3d 912, 915-19 (8th Cir. 2008); see also United States v. Shenandoah, 595 F.3d 151, 163 (3rd Cir. 2010) (ruling that it was "not reach[ing]" the defendant's APA issue because defendant "was already a registered sex offender when SORNA was enacted, [and] SORNA only required him to keep his registration current on and after July 27, 2006")).

The Supreme Court in Carr "similarly express[ed] no view as to whether § 72.3 was properly promulgated [under the APA] -- a question that has also divided the Circuits." Carr, 130 S. Ct. at 2234 n.2; compare Cain, 583 F.3d at 419-24 (holding that the Attorney General lacked good cause for issuing the interim regulation without adhering to the APA's notice-and-comment and publication requirements); Valverde, 2010 WL 5263142, at *6 (same); with United States v. Dean, 604 F.3d 1275 (11th Cir. 2010) (finding no APA violation); United States v. Gould, 568 F.3d 459, 469-470 (4th Cir. 2009) (same). Indeed, three of the four Circuit panels that have ruled on this issue were internally split regarding whether the Attorney General's explanation constituted good cause under the APA. See Cain, 583 F.3d at 434-36 (Griffin, J., dissenting); Dean, 604 F.3d at 1282-90) (Wilson, J., concurring) (finding APA violation, but upholding conviction under harmless error analysis); Gould, 568 F.3d at 475-82 (Michael, J., dissenting).

These two Circuit splits deal with separate, but related, issues as to when "persons with pre-SORNA sex-offense convictions became subject to the Act's registration requirements." See Carr, 130 S. Ct. at 2234 n.2. For example, whether the interim regulation was promulgated according to the APA would not affect convictions in Circuits that have ruled that "persons with pre-SORNA sex-offense convictions became subject to the Act's registration requirements upon the statute's enactment in July 2006." Id.; see Cain, 583 F.3d at 433-34. Among the Circuits that have concluded that the Act did not apply to this group until the February 28, 2007 interim regulation, the Sixth and Ninth Circuits have ruled that the interim regulation was issued in violation of the notice and comment and publication requirements of the APA. See Cain, 583 F.3d at 419-424; Valverde, 2010 WL 5263142 at *6. Hence, in these Circuits, a person with a pre-SORNA sex-offense conviction becomes subject to SORNA's registration requirements not

on February 28, 2007, the date of the issuance of the interim regulation (in violation of the APA under Cain and Valverde), but instead on August 1, 2008, only after the issuance of SORNA's final guidelines, which were promulgated in accordance with the APA.  See United States v. Utesch, 596 F.3d 302, 311 (6th Cir. 2010) ("SORNA became effective against offenders convicted before its enactment thirty days after the final SMART guidelines were published:  that is, on August 1, 2008."); Valverde, 2010 WL 5263142 at *1 (same).

Therefore, three potential "effective dates" exist for persons with pre-SORNA sex-offense convictions:  SORNA's date of enactment (July 27, 2006); the date the Attorney General issued the interim rule (February 28, 2007); or thirty days after final guidelines were published (August 1, 2008).  For the reasons described below, this Court rules that SORNA's effective date for persons with pre-SORNA sex-offense convictions, like Cotton, is August 1, 2008.  Here, Cotton's indictment charges activity in violation of SORNA "between on or about May 2007 and on or about October 2008." Superseding Indictment at 1.  Because Cotton's indictment covers activity three months beyond SORNA's effective date, and it may be that Cotton traveled and failed to register after August 1, 2008 (but before October 30, 2008), the Court will not dismiss Cotton's indictment at this time for the Attorney General's failure to comply with the APA.  Cotton's other arguments are without merit.

## ANALYSIS

Cotton asserts eight separate grounds for the dismissal of his indictment.  His claims either contest SORNA'a applicability to him under the statutory and administrative framework of the Act, or challenge the Act's constitutionality.  The Court will first address the statutory and administrative arguments, and then the constitutional challenges.

## I.    Statutory and Administrative Arguments

### a.    Duty to Register under D.C. Law

Defendant argues that he was "unable" to register under SORNA because he does not have a duty to register under District of Columbia law. This argument has no merit. Defendant was convicted in 1997 of one count of indecent liberties with a child under North Carolina law and ordered to register as a sex offender for ten years following release from jail. See N.C. Gen. Stat. § 14-208.7 (1995); Gov't's Mot. at 1. Cotton allegedly moved to the District of Columbia within that ten-year registration period. Superseding Indictment at 1. The District of Columbia requires individuals convicted of sex offenses in other states to register in the District if their underlying convictions fit within the definition of a "registration offense" under the D.C. sex offender registration statute. See 22 D.C. Code § 4001, et seq. Here, Cotton's conviction for indecent liberties with a minor under North Carolina law is a "registration offense" under D.C. Code § 4001(8)(G). Hence, Cotton had a duty to register in the District of Columbia.

### b.    SORNA's Effective Date

The Circuits "have disagreed about the meaning and effect of [SORNA's] statutory/regulatory mosaic." DiTomasso, 621 F.3d at 21. Hence, this Court will first address the central disputed issue: exactly when "persons with pre-SORNA sex-offense convictions became subject to the Act's registration requirements." Carr, 130 S. Ct. at 2234 n.2. The issue turns on the "two pertinent clauses" of § 16913(d) and the extent of the Attorney General's delegated authority. See id. Courts have interpreted the statutory language in two ways. Some have ruled that the first clause, which states that "[t]he Attorney General shall have the authority to specify

8

the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter or its implementation in a particular jurisdiction," § 16913(d), "unambiguously delegated" to the Attorney General the authority to determine the applicability of SORNA to all persons with pre-SORNA sex-offense convictions.  See Cain, 583 F.3d at 419.  Other courts have focused on the second clause of § 16913(d)  -- "to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)" -- and determined that the Attorney General had more limited authority to determine SORNA's applicability "only as to specific subsets" of sex offenders who were "unable to initially register under SORNA."  See DiTomasso, 621 F.3d at 21.

Under the first view, courts have concluded that, by its plain language, SORNA did not apply to previously convicted sex offenders until the Attorney General so specified.  See Hatcher, 560 F.3d 229.  That plain meaning approach to statutory construction is well established.  Indeed, "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"  United States v. Ron Pair Enterp., Inc., 489 U.S. 235, 242 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)); see also Qi-Zhuo v. Meissner, 70 F.3d 136, 140 (D.C. Cir.1995) ("Where ... the plain language of the statute is clear, the court generally will not inquire further into its meaning.").  Only if the "plain language compels an 'odd result'" may the court "refer to evidence of legislative intent other than the text itself."  Engine Mfrs. Ass'n v. EPA, 88 F.3d 1075, 1088 (D.C. Cir. 1996).  "[R]ebutting the presumption created by clear language is onerous" and the proponent "must 'show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory

structure, it almost surely could not have meant it.'" Nat'l Public Radio, Inc. v. FCC, 254 F.3d 226, 230 (D.C. Cir. 2001)(quoting Engine Mfrs. Ass'n, 88 F.3d at 1089).

This Court joins the Circuits that have ruled that the plain language of SORNA clearly delegates authority to the Attorney General to specify the requirements of SORNA for all sex offenders who were convicted before SORNA's enactment. The two clauses of subsection 16913(d) support this interpretation. The first clause states that the Attorney General "shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter [i.e., July 27, 2006] or its implementation in a particular jurisdiction." 42 U.S.C. § 16913(d). "This clause, fairly read, delegates to the Attorney General the authority to specify the requirements of SORNA for all sex offenders who were convicted before the enactment of SORNA." Hatcher, 560 F.3d at 227. Congress selected the phrase "shall have the authority," which signals that Congress gave the Attorney General exclusive authority to determine the applicability of SORNA to pre-SORNA offenders. See id. Therefore, until the Attorney General affirmatively specified, SORNA's requirements would apply only prospectively and not to pre-SORNA offenders such as Cotton.

The second clause of § 16913(d) delegates to the Attorney General the authority "to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)." 42 U.S.C. § 16913(d). "The second clause of the subsection thus gives the Attorney General the authority to promulgate registration rules for two distinct groups of sex offenders: (1) sex offenders who were convicted before July 27, 2006, and (2) offenders who are unable to comply with subsection (b), the subsection containing SORNA's initial registration requirements." Hatcher, 560 F.3d at 227. The first and

second clauses, then, together delegate to the Attorney General the authority to (1) "specify the applicability" of SORNA with regard to pre-SORNA offenders and (2) "prescribe rules for the registration" of all pre-SORNA offenders <u>in addition to</u> "other categories of sex offenders" who are unable to comply with the initial registration requirements. <u>See</u> § 16913(d).

The title of § 16913(d) may appear to limit the applicability of the subsection to sex offenders "unable to comply with subsection (b)." <u>See Cain</u>, 583 F.3d at 416. But "[o]nly if we determine that the terms of a statutory provision are ambiguous are we then permitted to consider other evidence to interpret the meaning of the provision, including the legislative history and the provision's heading or title." <u>Hatcher</u>, 560 F.3d at 226; <u>see Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.</u>, 331 U.S. 519, 528-29 (1947) ("[T]he title of a statute and the heading of a section cannot limit the plain meaning of the text."). If the text of subsection (d) is not ambiguous -- and here it is not -- "its title makes no difference." <u>Cain</u>, 583 F.3d at 416. Furthermore, the title does not necessarily "conflict" with this Court's interpretation of § 16913(d), it merely "refers to the authority given to the Attorney General by the second clause of subsection (d)" rather than the first. <u>See id.</u>

Here, moreover, the plain language does not "compel[] an 'odd result.'" <u>See Engine Mfrs. Ass'n</u>, 88 F.3d at 1088; <u>Hatcher</u>, 560 F.3d at 228 ("[Subsection (d) does not] run[] counter to the clearly expressed congressional intent or produce[] an absurd outcome."). "Given the patchwork of state approaches towards sex offender registration that existed prior to the enactment of SORNA, it was not 'absurd' for Congress to delegate this authority to the Attorney General, with the intent that he exercise it to effectuate a comprehensive registration system." <u>Hatcher</u>, 560 F.3d at 228. Indeed, subsection (d) delegated to the Attorney General the authority to determine

whether SORNA's requirements apply to sex offenders with pre-SORNA convictions, and that is precisely what the Attorney General specified in his February 28, 2007 interim rule.

Under the second view, which this court does not adopt, courts have ruled that the plain language is ambiguous and that, read in context, SORNA applied to previously convicted sex offenders on the date of its enactment.  See DiTomasso, 621 F.3d at 21 ("No less an authority than the Supreme Court has warned that 'the meaning of statutory language, plain or not, depends on context.'") (quoting Holloway v. United States, 526 U.S. 1, 7 (1999)).  In DiTomasso, the First Circuit observed that the language in the first clause of subsection (d) "might appear straightforward if read in a vacuum, [but] a mechanical reading of it as applying to all previously convicted sex offenders would wrest it from its contextual moorings." 621 F.3d at 22.  Similarly, the Tenth Circuit in Hinckley found the language ambiguous and endeavored to determine Congress's intent:

> [W]hen considered in context, it becomes clear that Congress did not intend to exempt all sex offenders convicted before July 27, 2006, from SORNA's requirements. Many sex offenders convicted before that date (those still incarcerated or awaiting sentencing) would be able to comply with subsection (b)'s initial registration requirement. There would be no reason for Congress to exempt such sex offenders. Congress was likely concerned with old convictions -- offenders who had already served their sentences and never before had been required to register.

Hinckley, 550 F.3d at 934.

After similarly ruling that subsection (d) was ambiguous, the Eighth Circuit in May determined that an alternative interpretation that limited the Attorney General's authority was "eminently reasonable." May, 535 F.3d at 918 ("Although the word 'shall' indicates a congressional directive, the question remains as to what § 16913(d) was specifically directing the Attorney General to regulate.").  The court in May concluded that "[a]n additional possible

meaning of subsection (d) is that past offenders . . . are included *within* (and not a separate group *from*) the broader category of 'sex offenders who are unable to comply with subsection (b),' and it is only as to those 'sex offenders who are unable to comply with subsection (b)' that the Attorney General was given authority under subsection (d) to issue clarifying regulations." Id. (quoting United States v. Beasley, 2007 WL 3489999 (N.D. Ga. Oct. 10, 2007)) (emphasis in May). This "additional possible meaning of subsection (d)," the court concluded, was "supported by the use of the statutory terminology '*other* categories of sex offenders who are unable to comply with subsection (b) of this section.'" May, 535 F.3d at 918 (quoting § 16913(d)). The "offenders convicted before July 27, 2006" could be "included within the 'other categories of sex offenders who are unable to comply with subsection (b) of this section.'" Id. And, "at the very least," this alternative possible meaning "creates an ambiguity, and triggers the permissible reference to the title." Id. (citing INS v. Nat'l Ctr. for Immigrants' Rights, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.")). Hence, when "considering § 16913(d)'s title and the overall design of SORNA," the May court concluded that "subsection (d) 'is very narrow in scope: only those currently unregistered offenders literally *unable* to comply with [subsection] (b) because of the age of their convictions are within the grey area which the Attorney General is authorized to illuminate by rule.'" May, 535 F.3d at 918-19 (citations omitted).

This view strays too far from the plain, unambiguous language of section 16913(d) of SORNA. These courts have mistakenly attempted to craft Congress's intent, its "likely concern[s]," and "additional possible meaning[s]" from strained reinterpretations of that statutory text. See Hinckley, 550 F.3d at 934; May, 535 F.3d at 918-19. But this is not one of the "rare

cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters," see Ron Pair Enterp., Inc., 489 U.S. at 242, and the government cannot "show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it." Nat'l Public Radio, Inc., 254 F.3d at 230 (quoting Engine Mfrs. Ass'n, 88 F.3d at 1089). To be sure, courts may be uncomfortable adopting a statutory interpretation that will reduce the number of sex offender registration convictions under SORNA, but this Court must follow Congress's stated intent and not substitute alternate meanings for the plain language of the statute.

In this Court's assessment, the "alternative interpretation of § 16913(d) is foreclosed by the plain language of the subsection." Hatcher, 560 F.3d at 228. Indeed, that "interpretation effectively writes the first clause of § 16913(d) out of the statute" and hence "is not a tenable interpretation." Hinckley, 550 F.3d at 949 (McConnell, J., dissenting). A straightforward reading of § 16913(d) reveals a reference to two distinct categories of sex offenders: "[t]he second clause of the subsection specifies that the Attorney General may prescribe registration rules for 'such sex offenders,' i.e. pre-SORNA offenders, *and* for other categories of sex offenders who are unable to comply with the initial registration requirements." Hatcher, 560 F.3d at 228 (emphasis in original). Thus, "[i]t is . . . clear that the category of pre-SORNA offenders is a distinct category from 'categories of sex offenders who are unable to comply with subsection (b),' and the category of pre-SORNA offenders is not included within this latter group. To interpret § 16913(d) as including the set of pre-SORNA offenders within the set of 'categories of sex offenders who are unable to comply with subsection (b)' ignores the term 'other,' which

indicates that the two sets are distinct." Id.; see also Hinckley, 550 F.3d at 951 (McConnell, J., dissenting)("It would be like interpreting a statute that applies to 'humans and to other categories of primate who walk on two legs' as excluding paraplegic humans.").

The two clauses of § 16913(d) give the Attorney General distinct authorities -- to determine the retroactivity of SORNA and to prescribe rules for registration under SORNA. Neither clause is itself ambiguous; nor does reading the clauses together produce any ambiguity or an odd result. See Hatcher, 560 F.3d at 228-29; Hinckley, 550 F.3d at 949-52 (McConnell, J., dissenting). To adopt the alternative interpretation urged by some courts as better accomplishing a perceived legislative intent would simply ignore the plain language of § 16913(d) actually employed by Congress, which this Court will not do. Hence, the Court concludes that SORNA did not apply to previously convicted sex offenders until the Attorney General promulgated a rule saying so. That leads to the question, discussed below, whether the interim rule, promulgated on February 28, 2007, set that effective date or whether it was issued in violation of the APA, and therefore could not do so.

     c. <u>Administrative Procedure Act</u>

Pursuant to the authority provided in § 16913(d), on February 28, 2007, the Attorney General issued an interim rule making SORNA retroactive to all sex offenders convicted prior to July 27, 2006. 28 C.F.R. § 72.3. The interim rule was made effective immediately and was issued without a pre-promulgation notice or comment period, although the Attorney General stated that he would accept comments on the rule through April 30, 2007. See 72 Fed. Reg. at 8895-97 (2007). On July 2, 2008, the Attorney General published the final Sex Offender

Monitoring, Apprehending, Registering and Tracking ("SMART") Guidelines for jurisdictions to implement SORNA. See 73 Fed. Reg. 38030 (July 2, 2008).

Generally, under the APA, an agency must follow specific procedures before issuing a rule. The APA requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register," 5 U.S.C. 553(b); that "[a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission[s]," id. § 553(c); that "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose," id.; and that a "substantive rule" shall be published "not less than 30 days before its effective date," id. § 553(d). See U.S. Telecom Ass'n v. F.C.C., 400 F.3d 29, 40 (D.C. Cir. 2005).

However, the agency is relieved of these notice and comment obligations "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). The agency may also be excused from the required 30-day delay in a published rule's effective date "for good cause found and published with the rule." § 553(d)(3). In issuing the interim rule on the retroactivity of SORNA, the Attorney General invoked these good cause exceptions:

> The immediate effectiveness of this rule is necessary to eliminate any possible uncertainty about the applicability of the Act's requirements -- and related means of enforcement, including criminal liability under 18 U.S.C. 2250 for sex offenders who knowingly fail to register as required -- to sex offenders whose predicate convictions predate the enactment of SORNA. Delay in the implementation of this rule would impede the effective registration of such sex offenders and would impair immediate efforts to protect the public from sex offenders who fail to register through prosecution and the imposition of criminal sanctions. The resulting practical dangers include the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders

that could have been prevented had local authorities and the community been aware of their presence, in addition to greater difficulty in apprehending perpetrators who have not been registered and tracked as provided by SORNA. This would thwart the legislative objective of "protect[ing] the public from sex offenders and offenders against children" by establishing "a comprehensive national system for the registration of those offenders," SORNA § 102, because a substantial class of sex offenders could evade the Act's registration requirements and enforcement mechanisms during the pendency of a proposed rule and delay in the effectiveness of a final rule.

It would accordingly be contrary to the public interest to adopt this rule with the prior notice and comment period normally required under 5 U.S.C. 553(b) or with the delayed effective date normally required under 5 U.S.C. 553(d).

72 Fed. Reg. at 8896-97.

Cotton argues that the Attorney General did not demonstrate "good cause" to bypass the notice and comment and publication requirements of the APA. Indeed, the D.C. Circuit instructs that the "good cause" exception is to be "narrowly construed and only reluctantly countenanced. . . . [I]ts use should be limited to emergency situations." Utility Solid Waste Activities Group v. Envtl. Prot. Agency, 236 F.2d 749, 754 (D.C. Cir. 2001) (quoting Tenn. Gas Pipeline Co. v. FERC, 969 F.2d 1141, 1144 (D.C. Cir 1992)). The Sixth and Ninth Circuits have ruled that the government did not meet the heavy "burden to show that good cause exists." Cain, 583 F.3d at 422; see Valverde, 2010 WL 5263142, at *5 ("[T]he Attorney General's statement accompanying the interim rule provided no rational justification for why complying with the normal requirements of the APA would have resulted in a sufficient risk of harm to justify the issuance of the February 28, 2007 retroactivity determination on an emergency basis."). The Fourth and Eleventh Circuits have reached the opposite conclusion. See Gould, 568 F.3d at 470 ("In the circumstances, we conclude that the Attorney General had good cause to invoke the exception to providing the 30-day notice."); Dean, 604 F.3d at 1282 (rejecting the reasoning in Cain and

holding that "[t]he Attorney General had good cause to bypass the Administrative Procedure Act's notice and comment requirement"); see also Dixon, 551 F.3d at 582 (noting only that defendant made a "frivolous" APA argument, but acquitting defendant because his conviction violated the *Ex Post Facto* Clause).

The government argues that the courts in Dean and Gould are correct, and that the Attorney General properly invoked the public interest element of the good cause exception when he issued the interim rule. Gov't's Supp. Mot. in Opp'n. to Def.'s Mot. to Dismiss ("Gov't Supp. Opp'n") [Docket Entry 19] at 2-3. In Gould, the Fourth Circuit concluded that the Attorney General had good cause "to invoke the exception to providing the 30-day notice" because "there was need for legal certainty about SORNA's 'retroactive' application," "a concern for public safety that these offenders be registered in accordance with SORNA as quickly as possible," and "the Attorney General did provide for and receive post-promulgation public comments." Gould, 568 F.3d at 470. The Eleventh Circuit in Dean agreed with Gould that the "public safety argument" constituted good cause, but noted that the need for legal certainty alone may not be sufficient to establish good cause, and "that allowing post-promulgation comments to resolve any harm caused by a lack of notice and comment would render the notice and comment provision toothless." Dean, 604 F.3d 1281.

This Court agrees with the Sixth Circuit's observation in Cain that the Attorney General's explanation that delay would "eliminate any possible uncertainty about the applicability of the Act's requirements" is insufficient, because any regulation has the effect of resolving uncertainty. See Cain, 583 F.3d at 421. "[G]ood cause to suspend notice and comment must be supported by more than the bare need to have regulations." Nat'l Ass'n of Farmworkers Orgs. v. Marshall, 628

F.2d 604, 621 (D.C. Cir. 1980). Indeed, "[i]f 'good cause' could be satisfied by an Agency's assertion that 'normal procedures were not followed because of the need to provide immediate guidance and information[,] . . . then an exception to the notice requirement would be created that would swallow the rule.'" Valverde, 2010 WL 5263142, at *6 (quoting Zhang v. Slattery, 55 F.3d 732, 746 (2d Cir. 1995)). Hence, "[a] 'desire to provide immediate guidance, without more, does not suffice for good cause.'" Cain, 583 F.3d at 425 (quoting Mobil Oil Corp. v. Dep't of Energy, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979)).

Beyond "eliminat[ing] any possible uncertainty about the applicability of the Act's requirements," however, the government merely highlights the Attorney General's explanation that SORNA creates a comprehensive federal registration requirement, enforced by a substantial federal criminal penalty. Gov't Supp. Opp'n at 5; see 72 Fed. Reg. at 8896-97. The government maintains that the Attorney General identified "specific reasons" for good cause that "certainly satisf[y] the definition of an emergency." Gov't Supp. Opp'n at 8. Citing the preamble to the interim rule, the government highlights the Attorney General's explanation of "the observed trend of pre-SORNA sex offenders crafting arguments that SORNA does not apply to them" and the "risk of sexual assaults and child sexual abuse if pre-SORNA sex offenders – 'virtually the entire sex offender population'" – were not required to register under SORNA. Id. (citing 72 Fed. Reg. at 8896-97). Given that the "risk of recidivism posed by sex offenders is 'frightening and high[,]'" Smith v. Doe, 538 U.S. 84, 103 (2003) (internal citations omitted), the government argues that any delay of SORNA's application to all sex offenders would be contrary to the public interest. Gov't Supp. Opp'n at 5. Furthermore, the government notes that "SORNA brings to bear

the power of federal law enforcement, including the United States Marshals Service, to assist in locating and apprehending sex offenders who fail to register." Gov't Supp. Opp'n at 9.

A "trend" of "virtually the entire sex offender population" attempting to evade SORNA registration, or a "frightening and high" risk of recidivism for sex offenders might well qualify as an emergency" and thus establish good cause. But these statements are simply not present in the Attorney General's good cause explanation. See 72 Fed. Reg. at 8896-97. And the interim rule makes no mention of the Marshals Service and how it might "apprehend[] sex offenders who fail to register." See id.

In Dean, the Eleventh Circuit supports its good cause analysis by observing that SORNA "expands the definition of sex offender to include . . . foreign offenders and some juvenile offenders" and provides "substantially" enhanced penalties compared to previous federal registration offenses. Dean, 604 F.3d at 1282. But in his concurrence in Dean, in which he concluded that the Attorney General failed to establish good cause, Judge Wilson accurately notes that "the majority opinion's arguments for good cause on the basis of extra help from the U.S. Marshals, and the expanded scope and enhanced penalties of SORNA, do not explicitly appear in the 400-word justification that the APA required the Attorney General to publish as a condition of good cause." Id. at 1287 n.13 (Wilson, J., concurring). "Courts are not supposed to help an administrative agency make its case when the agency by itself cannot." Id. A "reviewing court should not attempt itself to make up for such deficiencies; [it] may not supply a reasoned basis for the agency's action that the agency itself has not given." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).

The government asserts that the APA good cause standard extends beyond "emergency situation[s]," to "where delay could result in serious harm."  Gov't Supp. Opp'n at 8, 9; Dean, 604 F.3d at 1281 ("Delaying implementation of the regulation to accommodate notice and comment could reasonably be found to put the public safety at greater risk.").  Perhaps so, but whether the government must demonstrate an "emergency situation" or just a risk of serious harm, the government's argument ultimately falls under the weight of D.C. Circuit case law that has repeatedly instructed that the good cause standard must be "narrowly construed and only reluctantly countenanced."  Utility Solid Waste Activities Group, 236 F.2d at 754;  see also Tenn. Gas Pipeline Co., 969 F.2d at 1144; Jifry v. F.A.A., 370 F.3d 1174, 1179 (D.C. Cir. 2004);  New Jersey v. EPA, 626 F.2d 1038, 1045 (D.C. Cir. 1980).

> The exemption of situations of emergency or necessity is not an "escape clause" in the sense that any agency has discretion to disregard its terms or the facts.  A true and supported or supportable finding of necessity or emergency must be made and published.  "Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings.

 New Jersey v. EPA, 626 F.2d at 1046 (quoting S. Doc. No. 248, 79th Cong., 2d Sess. 200 (1946)).  The Attorney General's proffered reasons for good cause here simply do not meet this strict standard.

Exceptions to the good cause requirement have been found if Congress "set[s] aside the APA when it specifically requires rapid action."  Cain, 583 F.3d at 421; see Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1237 (D.C. Cir. 1994) (finding good cause when "Congress has expressed its clear intent that APA notice and comment procedures need not be followed").  Here, when Congress delegated regulatory authority to the Attorney General, it did not excuse

him from following the APA's requirements.  See Cain, 583 F.2d at 421.  No indication of such

urgency can be found in section 16913(d) or elsewhere in SORNA.  Indeed, "in spite of the

Attorney General's hurried rulemaking, no state thus far has elected to implement SORNA, and

the Attorney General recently granted a blanket one-year extension to all jurisdictions to allow

substantial implementation of the Act."  Valverde, 2010 WL 5263142, at *7 (quoting Gould, 568

F.3d at 480 (Michael, J. dissenting)).

        This Court concludes that the government cannot demonstrate that the effective date of

SORNA poses an "emergency situation" or that "delay could result in serious harm," given the

pre-existing state and federal sex offender registry schemes that were in place already and that

allowed for the "prosecution and imposition of criminal sanctions" for a sex offender's failure to

register.   See Cain, 583 F.3d at 422.  The retroactive application of SORNA therefore "does not

present the type of safety emergency that some courts have relied upon to find just cause to

bypass notice and comment."  Id.  Public safety emergency situations -- rarely found -- have been

used to dispense with APA requirements when "a safety investigation shows that a new safety

rule must be put in place immediately,"  Util. Solid Waste Activities Group, 236 F.3d at 754-55,

or when "the agency had specific reasons to conclude that its existing regulations insufficiently

protected public safety," Cain, 583 F.3d at 422;  see also Jifry, 370 F.3d at 1180 (finding good

cause for regulations that suspended an individual's pilot certificate if the TSA determined that

pilot posed a security threat in light of "legitimate concern over the threat of further terrorist acts

involving aircraft in the aftermath of September 11, 2001").  This Court is limited to reviewing

the Attorney General's proffered justification for good cause, and here he "gave no specific

evidence of actual harm in his conclusory statement of reasons, and gave no explanation for why he could act in an emergency fashion" to apply SORNA retroactively. Cain, 583 F.3d 422.

Moreover, "[t]he fact that the regulation imposes a new obligation, on pain of severe criminal sanctions, only reinforces the need for the statutory protections in place when an agency engages in quasi-legislation." Id. In United States v. Picciotto, the D.C. Circuit held that the Park Service had not properly promulgated a rule under the APA and noted that "before a person is threatened with jail . . . the government must ensure that the rule itself is not in violation of the law." 875 F.2d 345, 349 (D.C. Cir. 1989). The court reversed the defendant's regulatory conviction, observing that "[c]ertainly, a criminal prosecution founded on an agency rule should be held to the strict letter of the APA." Id. at 346. Where defendants face felony charges and prison sentences of up to ten years, as is the case here, adherence to the procedural requirements of the APA is even more critical.

This Court is not persuaded by the harmless error argument advanced in the Dean concurrence. See Dean, 604 F.3d at 1288-90 (Wilson, J., concurring). The argument proceeds that "'[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for consideration.'" Id. at 1288 (quoting PDK Labs. Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004). Under this analysis, any SORNA offender arrested more than 30 days after the promulgation of the interim regulation would not be prejudiced by the Attorney General's failure to comply with the APA's pre-enactment delay requirement. And any offender who could not demonstrate that "he could have arguably mounted a 'credible challenge' for changing the rule as it affected him" would not be prejudiced by the Attorney General's failure to comply with the APA's notice and comment requirements.

See id. But this argument would eviscerate the good cause standard because "an agency could always violate the APA's procedural requirements based on the representation that it would have adopted the same rule had the proper process been followed." Utesch, 596 F.3d at 312 ("Courts have generally applied the harmless-error rule in the agency context when the procedural deficiencies did not defeat the purpose of the bypassed requirements. . . . Here, the process was fatally flawed; the Attorney General provided affected parties no opportunity to participate in the crafting of the interim rule *before* it purported to take effect against them."); Valverde, 2010 WL 5263142, at *9 n.3 ("'[T]he interim regulation's procedural defects were not harmless' because . . . '[t]he fact that the Attorney General eventually made SORNA retroactive through legitimate means cannot sustain prosecution of an individual based on conduct committed long before the final guideline's enactment.'")(quoting Utesch, 596 F.3d at 312-13).

Nonetheless, the indictment may survive Cotton's motion to dismiss despite the Court's conclusion that the interim rule is invalid under the APA. In Utesch, the Sixth Circuit assessed "whether there exists any valid regulation promulgated by the Attorney General pursuant to §16913(d)." 596 F.3d at 308. The court found "three candidates: (1) the February 28, 2007 interim regulation, (2) the preliminary SMART guidelines issued on May 30, 2007, and (3) the final SMART guidelines issued on July 2, 2008." Id. Because this Court concludes that the February 28, 2007 interim rule was not issued in accordance with the APA, that rule did not make SORNA effective against Cotton. The preliminary SMART guidelines, which were promulgated under notice and comment procedures, included a provision making SORNA retroactive. See id.; 72 Fed. Reg. at 30,212. The preliminary guidelines were published on May 30, 2007 and stated that comments would be accepted until August 1, 2007. 72 Fed. Reg. at

30,210.  Hence, those preliminary guidelines simply constituted a proposed rule, not a final rule, and did not have the force of law.  See Utesch, 596 F.3d at 310-11.  Subsequently, the Attorney General "issued the final SMART guidelines on July 2, 2008, responding to the comments received and maintaining that SORNA would be applied retroactively." Id. at 310; 73 Fed. Reg. at 38,030-31; 38,035-36; 38,046-47.  "Though the guidelines themselves provide an immediate effective date of July 2, 2008, the Attorney General provided no statement of reasons to establish 'good cause' for disposing of the thirty-day publication requirement." Utesch, 596 F.3d at 311 n.8; see 5 U.S.C. § 553(d).  Hence, "SORNA became effective against offenders convicted before its enactment thirty days after the final SMART guidelines were published:  that is, on August 1, 2008." Utesch, 596 F.3d at 307; accord  Valverde, 2010 WL 5263142, at *10.

This Court agrees with the reasoning of the Sixth and Ninth Circuits, under which the interim rule is invalid and SORNA did not become effective until August 1, 2008, thirty days after the final SMART guidelines were issued. Here, Cotton's indictment charges activity in violation of SORNA "between on or about May 2007 and on or about October 2008." Superceding Indictment at 1.  Hence, the charging period in Cotton's indictment extends three months beyond the August 1, 2008 SORNA effective date and therefore the indictment should not be dismissed at this time.  At least two other district courts have followed this logic.  In United States v. Coleman, 2009 WL 4255545 (E.D. Ky. Nov. 24, 2009), the indictment alleged that the defendant's actions occurred "[b]etween on or about a date in April, 2007, the exact date unknown, and April 28, 2009." Coleman, 2009 WL 4255545, at *1. The court reasoned that even though the interim rule could not be applied to the defendant in light of Cain, the final SMART guidelines "clearly" could be.  Id. at *4.  Similarly, another court decided not to dismiss the

defendant's indictment because it included a time period more than a year after August 1, 2008. See United States v. Jackson, 2010 WL 3325611, at *13 (N.D. Cal. Aug. 23, 2010). The court in Jackson reasoned that, "[c]onsidering only the face of the indictment, it is possible that Defendant committed the proscribed acts after August 1, 2008, the date of the adoption of the final regulations on retroactivity. Under these circumstances, dismissal of the indictment would be inappropriate." Id. The same is true here. Hence, the Court will not at this time dismiss Cotton's indictment for the Attorney General's failure to comply with the APA because it may be that Cotton traveled and failed to register after August 1, 2008 but before October 30, 2008.

### d. Implementation of SORNA

Cotton argues that because the District of Columbia has not yet implemented SORNA, he has no duty to register under SORNA. He asserts that "although SORNA became law on July 26, 2006, Congress did not identify a date upon which the sex offender provisions are to be effective, other than to state a deadline of July 27, 2009, for implementation of the Act by all jurisdictions." Def.'s Mot. to Dismiss Indictment ("Def.'s Mot.") [Docket Entry 10] at 10. Because the District of Columbia has not yet implemented SORNA's registration and notification requirements, Cotton asserts that "he cannot possibly be subject to the Act's constraints." Id. Cotton's argument "depends on a construction of SORNA that links the requirement imposed on the States to implement the registration standards mandated by SORNA in a manner that would have the requirement imposed on individuals be dependent on the State's implementation." Gould, 568 F.3d at 463. But SORNA's language does not provide that linkage.

Cotton asserts that, under section 16913(d), Congress delegated to the Attorney General the authority to specify the retroactive applicability of SORNA to persons "(a) 'convicted before

July 27, 2006,' (b) 'convicted before [SORNA's] implementation in a particular jurisdiction,' and (c) 'unable' to initially register under Section 16913(b) of the Act." Def.'s Mot. at 10. Therefore, defendant's argument continues, because the Attorney General has not affirmatively specified the retroactivity of SORNA to persons convicted before SORNA's "implementation in a particular jurisdiction" or to those "unable" to initially register, the Act does not yet apply to Cotton. Id. This is an attempt to rewrite the statute. Congress delegated to the Attorney General "the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this subchapter or its implementation in a particular jurisdiction." § 16913(d). And this is just what the Attorney General did: he expressly applied SORNA registration requirements "'to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act.'" United States v. Ambert, 461 F.3d 1202, 1206 (11th Cir. 2009)(quoting 28 C.F.R. § 72.3)(emphasis added). The Attorney General's regulations clarify that SORNA applies retroactively to sex offenders, like Cotton, who were convicted before SORNA's enactment, and these requirements to register are not "conditioned on a State's implementation of the Act." See Gould 568 F. 3d at 464.

The final SMART Guidelines, which the Attorney General issued on July 2, 2008, "provide guidance and assistance to the states and other jurisdictions in incorporating the SORNA requirements into their sex offender registration and notification programs." 73 Fed. Reg. at 38030. Cotton asserts that the SMART guidelines explain the duty to register under SORNA only after a jurisdiction implements SORNA: "sex offenders in these [] populations . . . must be registered by the jurisdiction when it implements the SORNA requirements in its system." 72 Fed. Reg. at 30228. But Cotton's argument "fails to appreciate the distinction

between a jurisdiction's duty to implement SORNA and a sex offender's duty to register."

United States v. Brown, 586 F.3d 1342, 1348 (11th Cir. 2008).  A sex offender's duty to register under SORNA is not contingent on a jurisdiction's implementation of SORNA. See Gould, 568 F.3d at 465 ("[T]he requirement imposed on individuals to register is independent of the requirement imposed on the States to implement the enhanced registration and notification standards of SORNA."); Hinckley, 550 F.3d at 939 (rejecting defendant's argument that it was impossible for him to register under SORNA because the state had not passed legislation implementing SORNA); Dixon, 551 F.3d at 582 (same).

The structure of SORNA's requirements indicates that the sex offenders' individual duty to register and the State's duty to enhance its registries and standards as mandated by the Act are separate.  See Gould, 568 F.3d at 464.  As the Attorney General's SMART Guidelines explain, "[s]ome of the provisions in SORNA are formulated as *directions to sex offenders,* including those appearing in sections 113(a)-(b) . . . .  Other SORNA provisions are cast as *directions to jurisdictions . . . .*"  73 Fed. Reg. at 38048 (emphasis added).  Furthermore, the SMART Guidelines "emphasize, with greater particularity, that 'SORNA applies to all sex offenders, including those convicted of their registration offenses prior to the enactment of SORNA or prior to particular jurisdictions' incorporation of the SORNA requirements into their programs.'"  Gould, 568 F.3d at 465 (quoting 73 Fed. Reg. at 38063).  "Accordingly, SORNA's requirement that a sex offender register applies whether registration would be accomplished through pre-SORNA registration facilities or under SORNA-complaint programs."  Id. at 465-66.  Cotton's duty to register under SORNA existed, then, whether or not D.C. had implemented SORNA's enhanced registration and notification standards.

e.  Sex Offenders "Unable" to "Initially Register"

Next, Cotton argues that he is "unable" to "initially register" under SORNA because his conviction pre-dates SORNA registration and notification requirements under section 16913(b). Section 16913(b) states that a sex offender "shall initially register (1) before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or  (2) not later than 3 business days after being sentenced for that offense, if the sex offender is not sentenced to a term of imprisonment."  Defendant's argument continues as follows:  due to his pre-SORNA conviction and pre-SORNA release from prison, he is unable to "initially register" under 16913(b); section 16913(d) authorizes the Attorney General to specify the "applicability of the requirements" of SORNA to "categories of sex offenders who are unable to comply with subsection (b)";  because the Attorney General has not yet defined the obligations of individuals like Cotton to "initially register," as required by 16913(d), Cotton does not have a duty to register under SORNA.   Def.'s Mot. at 13-14.

Cotton's argument fails because, as a threshold matter, he does not fall within the category of sex offenders "unable" to "initially register" described in section 16913(b).  That section applies to sex offenders who do not currently have any registration requirement:  sex offenders currently in prison or yet to be sentenced.  See id.  In contrast, Cotton is a sex offender with a current registration obligation who must "register, and keep [his] registration current" under state and federal law, covered by the registration requirements described under sections 16913(a) and (c).  See May, 535 F.3d at 919.  "A sex offender is able to register under SORNA if he is able to register by means of an existing state registration facility."  Gould, 568 F.3d at 466; see  73 Fed. Reg. at 38063 ("Jurisdictions are specifically required to register such sex offenders

if they remain in the [state or other jurisdiction's] system as prisoners, supervisees, or registrants.").   Hence, Cotton is "able" – indeed, he has a duty -- to register and keep his registration current under D.C. law, and he is therefore "able" to register under SORNA.

## II.   Constitutional Arguments

### a.   Non-Delegation

Cotton argues that Congress improperly delegated its legislative authority by allowing the Attorney General to determine the retroactive application of SORNA.  Derived from Article I, Section I of the Constitution -- which states that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States which shall consist of a Senate and House of Representatives," U.S. Const. art. I, § 1 -- "[t]he non-delegation doctrine is based on the principle of preserving the separation of powers between the coordinate branches of government." Ambert, 561 F.3d at 1212.  "[T]he doctrine holds that 'Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is [constitutionally] vested.'" Id. at 1213 (quoting Panama Ref. Co. v. Ryan, 293 U.S. 388, 421 (1935)).

The Supreme Court established the test for determining the constitutionality of a delegation of authority by Congress to another branch of government in J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394 (1928).  Congress may delegate authority to the executive to promulgate rules and create law only when Congress provides an "intelligible principle" to guide the delegated party.  See  276 U.S. at 409. A statute will survive a non-delegation challenge and be "constitutionally sufficient if Congress clearly delineates the general policy, the public agency

which is to apply it, and the boundaries of this delegated authority." American Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946); see also Mistretta v. United States, 488 U.S. 361, 372-73 (1989). The intelligible principle can be broad. See, e.g., Whitman v. American Trucking Ass'ns, 531 U.S. 457, 475-76 (2001) (upholding against a non-delegation challenge a statute that granted the EPA broad discretion to set national ambient air quality standards at levels "requisite to protect the public health"); Yakus v. United States, 321 U.S. 414, 420 (1944) (upholding a delegation to fix commodity prices that are "generally fair and equitable and will effectuate the purposes of this Act").

Defendant argues that Congress failed to articulate any policy to guide the Attorney General on SORNA's retroactivity. Def.'s Mot. at 16. In granting the Attorney General the "sole discretion" to determine who should be subject to SORNA, Cotton contends, "Congress handed the Attorney General the power of legislating the breadth of the Act." Id. To the contrary, Congress's delegation was "comfortably within the scope of discretion permitted by [Supreme Court] precedent." Ambert, 561 F.3d at 1213. SORNA's statement of purpose, to "establish[] a comprehensive national system" of sex offender registration to protect the public from sex offenders and offenders against children," 42 U.S.C. § 16901, provides an intelligible principle to guide the Attorney General in exercising his discretion. See United States v. Whaley, 577 F.3d 254, 264 (5th Cir. 2009); Ambert, 561 F.3d at 1213-14. "By setting forth the broad policy goal of protecting the public and seeking a 'comprehensive' national registry, Congress has suggested that the Attorney General should require pre-2006 sexual offenders to register to the extent that he determines it would contribute to the protection of the public and the comprehensiveness of a national sex offender registry." Ambert, 561 F.3d at 1214.

31

Cotton also overstates the authority Congress delegated to the Attorney General. Far from "legislating the breadth of the Act," as Cotton contends, the authority delegated to the Attorney General is quite narrow. Whaley, 577 F.3d at 264; Ambert, 561 F.3d at 1214. Indeed, "Congress defined the crimes which necessitate registration (42 U.S.C. § 16911); where the offender must register (42 U.S.C. § 16913(a)); the time period for registration (42 U.S.C. § 16913(b)); the method of registration (42 U.S.C. § 16913(b),(c)); the nature of information that registrants must provide (42 U.S.C. § 16914(a)(1)-(7)); the elements of the new federal crime (18 U.S.C. § 2250(a)); and the penalty for violation (18 U.S.C. § 2250(a))." Ambert, 561 F.3d at 1214. Congress delegated to the attorney general only "the discretion to determine whether this statute and all of its attendant requirements articulated by the legislature apply to a particular, capped class of offenders - *i.e.* those convicted prior to July 27, 2006." Id. at 1214. "[S]ince 1935, the Supreme Court has not struck down a single statute as an impermissible delegation of legislative power." Id. at 1213. This Court concludes that SORNA should not be the first. Congress's delegation to the Attorney General to determine the retroactive applicability of SORNA is well within the limits of permissible delegation. Hence, Cotton's non-delegation challenge fails.

   b.  *Ex Post Facto* Clause

Cotton argues that SORNA violates the *Ex Post Facto* Clause, U.S. Const. art. I, § 9, cl. 3, which prohibits Congress from enacting any law which "imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28-31 (1981); see Collins v. Youngblood, 497 U.S. 37, 41 (1990)("[T]he constitutional prohibition on *ex post facto* laws applies only to penal

statutes which disadvantage the offender affected by them.").  Cotton alleges that SORNA imposes an enhanced penalty that did not exist at the time he pled guilty to and was convicted of a sex offense in 1997.  Def.'s Mot. at 21.  And Cotton contends that, despite SORNA's stated intent as a civil and nonpunitive regime, the law is so punitive in its purpose and effects that it nonetheless violates the *Ex Post Facto* Clause.  See id. at 21-22.

In Smith v. Doe, 538 U.S. 84 (2003), the Supreme Court ruled that Alaska's sex offender registration law did not constitute retroactive punishment under the *Ex Post Facto* Clause.  The Smith Court detailed the framework for the *ex post facto* inquiry for retrospective laws.  See 538 U.S. at 92-96.  First, the Court must "ascertain whether the legislature meant the statute to establish 'civil' proceedings"  Id. at 92 (quoting Kansas v. Hendricks, 521 U.S. 346, 361 (1997)).  If the legislature's intent was to "impose punishment," the statute is unconstitutional, but if the legislature's intent "was to enact a regulatory scheme that is civil and nonpunitive," the court then must further examine "whether the statutory scheme is 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'"  Id. (quoting United States v. Ward, 448 U.S. 242, 248-249 (1980)).  There must be "'the clearest proof'. . .  to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."  Id. (quoting Hudson v. United States, 522 U.S. 93, 100 (1997)).

Whether a statutory scheme is civil or criminal "is first of all a question of statutory construction."  Id.  (quoting Hendricks, 521 U.S. at 361.)  Therefore, the Smith Court considered the text and structure of the Alaska Act.  See id. at 92-93.  The Alaska legislature's expressed intent in the statutory text was to "protect[] the public from sex offenders" and "[t]he legislature further determined that 'release of certain information about sex offenders to the general public

33

will assist in protecting the public safety.'" <u>Id.</u> at 93 (citation omitted).  The respondents in

<u>Smith</u>, who challenged the constitutionality of the Act and asserted that its purpose was punitive,

pointed out that the goal of "public safety" is "one of the purposes of criminal administration."

<u>Id.</u> at 93.  The Court disagreed, and explained that "where a legislative restriction 'is an incident

of the States' power to protect the health and safety of its citizens,' it will be considered 'as

evidencing an intent to exercise that regulatory power, and not a purpose to add to the

punishment.'" <u>Id.</u> at 93-94 (quoting <u>Flemming v. Nestor</u>, 363 U.S. 603, 616 (1960)).

Furthermore, "even if the objective of the Act is consistent with the purposes of the Alaska

criminal justice system, the State's pursuit of it in a regulatory scheme does not make the object

punitive." <u>Id.</u> at 94.

     Cotton contends that, unlike the statute in <u>Smith</u>, SORNA's statutory scheme "indicat[es]

. . . Congress' intent to <u>punish</u> sex offenders, regardless of their risk to public safety" because

Congress "made no finding that sex offenders have a high risk of re-offense." <u>See</u> Def.'s Mot. at

24-25.  Cotton also points out that SORNA vests the authority to promulgate regulations with the

Attorney General, whose main responsibility is enforcing criminal laws. <u>Id.</u> at 25.  But these

differences cannot counter Congress's stated non-punitive intent.  As in <u>Smith</u>, the legislature's

expressed intent in SORNA is public safety, "to protect the public from sex offenders and

offenders against children," 42 U.S.C. § 16901, and any criminal components, including the role

of the Attorney General or the criminal penalty in section 2250, are parts of a larger regulatory

scheme.  <u>See</u> <u>Carr</u>, 130 S. Ct. at 2240.  Indeed, "[s]ection 2250 is not a stand-alone response to

the problem of missing sex offenders; it is embedded in a broader statutory scheme enacted to

address the deficiencies in prior law that had enabled sex offenders to slip through the cracks."

34

Id.  Simply "[i]nvoking the criminal process in aid of a statutory regime does not render the statutory scheme itself punitive."  Smith, 538 U.S. at 96.  Hence, because Congress's stated intent is non-punitive, Cotton may only prevail if SORNA's statutory scheme is "'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'"  Id. at 92 (citations omitted).

To analyze the effects of Alaska's sex offender registration statute, the Smith Court referred to the seven factors noted in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963), as "useful guideposts."  See 538 U.S. at 97.  The Mendoza-Martinez factors most relevant to the Court's analysis were "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose."  Id.  The Smith Court ruled that each factor supported its decision that Alaska's sex offender registration statute did not violate the *Ex Post Facto* Clause.  Id. at 97-105.  Indeed, "[o]ur system does not treat dissemination of truthful information in furtherance of a legitimate government objective as punishment."  Id. at 98.  And "[a]lthough the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record."  Id. at 101.  Finally, the "'most significant' factor" in a court's "determination that the statute's effects are not punitive" is "[t]he Act's rational connection to a nonpunitive purpose."  Id. at 102.  The Smith Court ruled that the sex offender registration statue was

rationally connected to its stated purpose, "'public safety, which is advanced by alerting the public to the risk of sex offenders in their communit[y].'" Id. at 103 (citations omitted).

Attempting to distinguish Smith, Cotton highlights SORNA's criminal penalty of up to ten years for a single violation and registration requirements that can include multiple in-person reports per year. See Def.'s Mot. at 27-28. SORNA's penalty provision and reporting requirements may be more onerous than the Alaska statute at issue in Smith, but these differences cannot establish by "clearest proof" that SORNA's overall regulatory scheme is punitive. See Smith, 538 U.S. at 92. And on the "most significant" factor -- "the Act's rational connection to a nonpunitive pupose" -- SORNA is on all fours with the Alaska statute, with a stated purpose of "public safety." Id. 538 U.S. at 103. Cotton maintains that SORNA's requirements are excessive, but this Court is not to engage in "an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy." See id. at 105. "The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." Id. at 105. Here, SORNA meets this standard and Cotton cannot by "clearest proof" override the stated intent of Congress. His *ex post facto* claim therefore fails.[1]

 c. Due Process Clause

Cotton asserts that the government's application of SORNA to him violates the Due Process Clause because he did not have actual notice of SORNA's requirements and the conduct criminalized by SORNA was "wholly passive" -- the "mere failure to register." See Lambert v.

---

[1] Some courts have addressed *ex post facto* issues raised under SORNA by focusing on the conduct required to violate SORNA. These courts have ruled that, as a threshold matter, section 2250 is not "retroactive" because it punishes an individual, not for the sexual offense committed prior to the enactment of SORNA, but for traveling in interstate commerce and failing to register. See, e.g., Gould, 568 F.3d at 466; United States v. LeTourneau, 534 F. Supp. 2d 718, 721 (S.D. Tex. 2008) (citing cases). The government does not argue, and this Court need not address, whether SORNA's enforcement scheme is retroactive because -- even if it is retroactive -- it does not violate the *Ex Post Facto* Clause under Smith.

California, 355 U.S. 225, 228 (1957).  In Lambert, the Court held that a statute requiring a felon

to register with the City of Los Angeles without notice was inconsistent with due process.  Id.

The Court reasoned that it was unconstitutional to punish Lambert for a crime of omission

because her obligation to register was based only on her status as a felon, and she was unaware of

the registration requirements.  Id.  Cotton argues that, like Lambert, he did not receive notice

regarding his obligation to register under SORNA.  Def.'s Mot. at 29.  Furthermore, Cotton

contends, the enforcement provision of SORNA requires that a defendant "knowingly" fail to

register to violate SORNA. See 18 U.S.C. § 2250.

Lambert is inapposite to the instant case.  "Unlike an isolated city ordinance that requires

all members of the broad class of all felons to register, SORNA instead criminalizes the failure to

register of a much more narrowly targeted class of persons in a context where sex-offender

registration has been the law for years." Shenandoah, 595 F.3d at 160.  Sex offenders with

current registration requirements, like Cotton, have notice of state registration requirements;

therefore, they are not passive participants unaware of the illegality of failing to register.  See id.

Cotton had an affirmative duty to register under state law; indeed, upon his release from prison,

he signed a notice explaining his duty to register.  See Gov't's Opp. at 1-2.

Failure to register under SORNA does not fit into the narrow exception under Lambert

that "ignorance of the law" excuses criminal activity.  See Lambert, 355 U.S. at 228; Cheek v.

United States, 498 U.S. 192, 199 (1991) (noting that as a general rule, ignorance of the law does

not provide a defense).  Courts have consistently held that a defendant's knowledge of his or her

duty to register as a sex offender pursuant to state law satisfies the knowledge requirement under

SORNA.  See, e.g., May, 535 F.3d at 921 (holding that notice of the duty to register under state

37

law provides notice of the duty to register under SORNA); <u>Hinckley</u>, 550 F.3d at 938 (same);

<u>United States v. Shenandoah</u>, 572 F. Supp. 2d 566, 580 (M.D. Pa. 2008) (citing cases), <u>aff'd</u>, 595

F.3d 151 (3rd Cir. 2010). This Court agrees. Hence, Cotton's due process argument is rejected.

    d.  <u>Commerce Clause</u>

Lastly, Cotton argues that the penalty provision of SORNA, 18 U.S.C. § 2250, exceeds

Congress's authority under the Commerce Clause. The Commerce Clause of the U.S.

Constitution gives Congress the power "[t]o regulate commerce with foreign nations, and

among the several states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. The Supreme

Court has identified three general categories of activity that Congress may regulate under the

Commerce Clause:

> First, Congress may regulate the use of the channels of interstate commerce.
> Second, Congress is empowered to regulate and protect the instrumentalities of
> interstate commerce, or persons or things in interstate commerce, even though the
> threat may come only from intrastate activities. Finally, Congress' commerce
> authority includes the power to regulate those activities having a substantial
> relation to interstate commerce, *i.e.,* those activities that substantially affect
> interstate commerce.

<u>United States v. Lopez</u>, 514 U.S. 549, 558-59 (1995) (citations omitted); <u>see also</u> <u>Gonzales v.</u>

<u>Raich</u>, 545 U.S. 1, 16-17 (2005); <u>United States v. Morrison</u>, 529 U.S. 598, 608-09 (2000).

Cotton contends that the enforcement provision of SORNA cannot be justified under the

first two <u>Lopez</u> prongs because it does not regulate the channels of interstate commerce or

concern the regulation of persons or things in interstate commerce. Def.'s Mot. at 29-30.

Therefore, the argument goes, it must be evaluated under the third <u>Lopez</u> prong, which permits

only the regulation of "those activities that substantially affect interstate commerce." <u>Lopez</u>, 514

U.S. at 558.  Cotton asserts that a sex offender registry is akin to regulation of domestic violence, which the Supreme Court has ruled lacks a substantial relation to interstate commerce.  See Morrison, 529 U.S. at 612-13 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity.").

To the contrary, section 2250 falls squarely within the first two prongs of Lopez because it applies only to those failing to register or update a registration after traveling in interstate commerce.  Congress may forbid or punish the use of channels of interstate commerce "to promote immorality, dishonesty, or the spread of any evil or harm to the people of other states from the state of origin."  Brooks v. United States, 267 U.S. 432, 436 (1925); see Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 256 (1964) ("[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.").  "Through § 2250, Congress has forbidden sex offenders from using the channels of interstate commerce to evade their registration requirements."  Whaley, 577 F.3d at 258.   "[E]ven if [the court] were to assume that the harms and targeted illegal conduct were purely local in nature, the use of the *channels* and *instrumentalities* of interstate commerce is necessarily part of the commission of the targeted offense under 18 U.S.C.  § 2250."  Ambert, 561 F.3d at 1211.   This Court agrees with the several Circuits that have ruled "that § 2250 is a legitimate exercise of congressional Commerce Clause authority."  United States v. Guzman, 591 F.3d 83, 90 (2nd Cir. 2010), cert. denied, 130 S. Ct. 3487 (2010); accord  United States v. George, 625 F.3d 1124, 1129-30 (9th Cir. 2010); Whaley, 577 F.3d at 258;  Gould, 586 F.3d at 470-72;  Ambert, 561 F.3d at 1210; Dixon, 551 F.3d at 583-84;  Hinckley, 550 F.3d at 940; May, 535 F.3d at 921-22.

To the extent that Cotton also suggests that the registration scheme in § 16913 violates the Commerce Clause, this Court disagrees. Section 16913 "may regulate purely intrastate activities by requiring sex offenders to register in the first place and to keep current in their registrations[;] [h]owever, § 16913 does not exist in a vacuum." Guzman, 591 F.3d at 90. It must be analyzed in connection with § 2250, which also was enacted as part of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587. See Whaley, 577 F.3d at 259. SORNA's goal -- to "establish[] a comprehensive national system for the registration of [sex] offenders," § 16901 -- "focuses on the problem of sex offenders escaping their registration requirements through interstate travel [] rather than on requiring sex offender registration generally." Id. Indeed, at the time that SORNA was enacted in 2006, every state and the District of Columbia already had enacted a sex offender registration law. Id.; see also Guzman, 591 F.3d at 91. Congress enacted SORNA to prevent sex offenders from evading "all registration requirements just by moving to another state." Guzman, 591 F.3d at 91.

Courts have thus upheld the registration provision of SORNA under the Necessary and Proper Clause of the Constitution, U.S. Const., art. I, § 8, cl. 18. See, e.g., Guzman, 591 F.3d at 91; United States v. Howell, 552 F.3d 709, 717 (8th Cir. 2009) ("Section 16913 is constitutional under Congress's authority to use the necessary and proper means to further its commerce clause power because it 'is a necessary part of a more general regulation of interstate commerce.'"). "Where necessary to make a regulation of interstate commerce effective, Congress may regulate even those intrastate activities that do not themselves substantially affect interstate commerce." Raich, 545 U.S. at 35 (Scalia, J., concurring). "Requiring sex offenders to update their registrations due to intrastate changes of address or employment status is a perfectly logical way

to help ensure that states will more effectively be able to track sex offenders when they do cross state lines." <u>Guzman</u>, 591 F.3d at 91. And "to the extent that § 16913 regulates solely intrastate activity, its means 'are "reasonably adapted" to the attainment of a legitimate end under the commerce power,' and therefore proper." <u>Id.</u> (citations omitted); <u>see also</u> <u>Whaley</u>, 577 F.3d at 260-61; <u>Ambert</u>, 561 F .3d at 1212; <u>Howell</u>, 552 F.3d at 714-15.  Hence, Cotton's Commerce Clause challenge fails.

## <u>CONCLUSION</u>

For the reasons explained above, the Court will deny Cotton's motion to dismiss his indictment.  A separate Order accompanies this memorandum opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:   January 20, 2011